**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

WILLIAM C. COLLINS                     :
      v.                              :
                              :
UNITED STATES OF AMERICA,               :          CIVIL NO. L-02-3023
                              :
      and                             :
                              :
ESTATE OF HAROLD TOLBERT                :

**MEMORANDUM**

On October 21, 2004, the Defendant United States filed a Motion to Dismiss for Lack of

Subject Matter Jurisdiction.  On November 4, 2004, Plaintiff William C. Collins ("Collins") filed

a Motion for Summary Judgment.[1]  Following discovery and further briefing, the Court held an

evidentiary hearing on November 14, 2005.  For the reasons stated below, the Court will, by

separate order,

      (i)      GRANT the United States's Motion to Dismiss;

      (ii)     DENY Collins's Motion for Summary Judgment; and

      (iii)    DIRECT the Clerk to CLOSE the case.

**I.     Background**

This case arises out of a motor vehicle accident that occurred on November 12, 2001,

when Collins was struck by a government-owned vehicle (GOV) operated by the late Harold

Tolbert ("Tolbert").  (Compl. ¶¶ 4, 5, 7, 14-16.)  Collins alleges that Tolbert, who was an

employee of the United States Defense Security Service ("DSS"), was acting within the scope of

his employment.  (Compl. ¶¶ 3, 5-7.)  On September 12, 2002, Collins filed this action against

---

[1]      The motions were dismissed as premature.  They were reinstated as of the date of
the hearing, November 14, 2005.

Tolbert[2] and the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671, *et seq.*

The Federal Tort Claims Act ("FTCA") waives the government's sovereign immunity and confers subject matter jurisdiction on federal courts for suits seeking damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). If the government's sovereign immunity is waived, the government is liable for the negligent act of its employee, and the employee is immunized from liability for his conduct. See Maron v. United States, 126 F.3d 317, 321 (4th Cir. 1997).

The United States moved to dismiss for lack of subject matter jurisdiction, contending that Tolbert was acting outside the scope of his employment. If this Court grants the motion, Collins may pursue Tolbert's estate in Maryland state court.[3] If, however, the Court finds that Tolbert was acting within the scope of his employment, the sole remaining issue is the measure of damages because the United States concedes Tolbert's negligence. (Joint Status Report 10/18/05.)

On November 14th, this Court held an evidentiary hearing to resolve the "scope of employment" issue. See Jamison v. Wiley, 14 F.3d 222, 236 (4th Cir. 1994) ("The federal courts

---

[2]    Tolbert passed away after Collins filed this action. On September 3, 2003, the Court granted Collins leave to file an amended complaint, naming Tolbert's estate as a defendant.

[3]    Tolbert's estate is worth less than $2,000. (Reply to Am. Compl., 1.) While Tolbert's personal representative is a nominal party, she played no active role in this case. This accident is also not covered by Tolbert's insurance carrier, Nationwide Insurance Company. Tolbert's policy covered his personal car but excluded coverage when Tolbert drove a government car. (M. to Withdraw, 1, Ex. A.)

of appeals have consistently recognized that a district court has the power to hold a limited evidentiary hearing to resolve factual disputes that bear on a scope-of-employment issue properly before it in a Westfall Act case.").[4]

## II.     Standard of Proof

Both sides agree that Collins must prove by a preponderance of the evidence that Tolbert was acting within the scope of his employment.  See <u>Maron v. United States</u>, 126 F.3d 317, 323 (4th Cir. 1997).

## III.    Applicable Law

To determine whether an employee is acting within the scope of his employment, the Court must apply the law of the state where the conduct occurred.  See <u>Gutierrez de Martinez v. Drug Enforcement Admin.</u>,111 F.3d 1148, 1156 (4th Cir.1997).  Maryland law applies because the accident occurred along the shoulder of I-95 while Tolbert was driving between Greenbelt, Maryland and Columbia, Maryland.  (Compl. ¶ 4.)

Maryland law provides that an employee is acting within the scope of his employment if his actions are "in furtherance of the employer's business and [are] 'authorized' by the employer."  <u>Sawyer v. Humphries</u>, 322 Md. 247, 587 A.2d 467, 470 (1991).   The factors that the Court must consider include whether the conduct is "of the kind the servant is employed to perform and [whether the conduct] occur[s] during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master."  <u>East Coast Lines v. Mayor</u>

---

[4]     The district court acts as the fact finder under the FTCA, which states, "any action against the United States under section 1346 shall be tried by the court without a jury..." 28 U.S.C.A. § 2402.

of Baltimore, 190 Md. 256, 58 A.2d 290, 304 (1948); see Sawyer, 587 A.2d at 471; Silvera v.
Home Depot U.S.A., Inc., 189 F. Supp. 2d 304, 308-09 (D. Md. 2002). Other factors include
whether the act is one commonly done by such an employee, the previous relations between the
employee and the employer, and whether the employer has reason to expect that such an act
would occur. See Sawyer, 587 A.2d at 471; Silvera, 189 F. Supp. 2d at 309. No single factor is
determinative. See Maron v. United States, 126 F.3d 317, 324 (4th Cir. 1997).

When a defendant was driving a company car, a rebuttable presumption arises that he
was acting within the scope of his employment. See Tregellas v. American Oil Co., 231 Md. 95,
188 A.2d 691, 693 (1963). "This presumption is only prima facie and may be rebutted and
overcome by evidence to the contrary produced during the trial by any of the parties to the suit."
Taylor v. Wesley Freeman, Inc., 186 Md. 474, 47 A.2d 500, 502 (1946).

**IV.     Facts**

A.     Background

Tolbert was a DSS special agent whose field office was in Washington, D.C. As a
special agent, he was responsible for conducting background investigations of candidates for a
security clearance. His duties included reviewing records, conducting interviews, and writing
reports. (Dep. Busker, 11.) Until July 2001, Tolbert's supervisor was Robert Bergman. Paul
Busker became Tolbert's supervisor after Bergman retired. (Def. 11/4/03 Mot. to Dismiss, 8.)
Joanne Moffett was DSS's Director of Human Resources. Id. at 3.

Tolbert was assigned a government owned vehicle ("GOV"). When DSS furnishes an
employee with a GOV, the agency will stipulate one of two parking arrangements: domicile
parking or satellite parking. (Dep. Moffett, 18.) An employee with domicile parking may park
the GOV at home. An employee with satellite parking must park the GOV at a satellite lot

between his home and his field office.[5]  Id.  Tolbert had satellite parking privileges only, and his

assigned lot was in Greenbelt, Maryland.  Id. at 22.  Tolbert's Washington office was roughly 14

miles south of the Greenbelt lot, and his home in Columbia, Maryland was roughly 25 miles

north of Greenbelt.

On workdays, Tolbert customarily left home by 7:00 a.m. and drove to the Greenbelt lot

where he picked up his GOV.  (Dep. Connie Tolbert, 32.)  He then drove into Washington to

conduct interviews.  Id.  To avoid rush hour traffic, Tolbert rarely remained in Washington after

4:00 p.m.  Id. at 34.  Tolbert frequently wrote reports at home in the afternoon.  Id. at 32.

DSS agents are responsible for "performing operator maintenance" on their GOVs.  (DSS

Reg. 15-20-R.)  This includes keeping the car clean.  (Dep. Busker, 31; Dep. Moffett, 18.)

According to the Director of Human Resources, Joanne Moffett, employees are expected to wash

their cars while on duty.  (Dep. Moffett, 49.)  If an employee is on duty, he does not need

permission to wash the car.  See id. at 50.[6]

Tolbert knew that when he was off duty he needed permission to wash his GOV in

Columbia.  Several times a year, Tolbert asked his former supervisor, Bergman, for permission

to take his GOV to Columbia for a wash.  (Dep. Connie Tolbert, 45.)  He stated, "I did ask

Bergman for permission each time before.  I did this because my area ended at Greenbelt.  With

the distance, location, off duty hours I thought he should know."  (Busker Interview Notes, 007.)

Tolbert later explained that washing the car in Columbia "was my personal thing - I would want

---

[5]       Domiciliary parking increases the United States's risk of liability under the
        Federal Tort Claims Act.

[6]       Because employees are expected to wash their cars on "company time," overtime
        pay is not awarded when they wash their cars outside normal work hours.  (Dep.
        Moffett, 51.)

[Bergman] to know." (JAG 2/19/02 Interview, P0005.)  Bergman approved each request.[7]  (Rep. Busker, 000490.)  Bergman had retired several months before the accident.  Tolbert never discussed washing his GOV in Columbia or keeping the GOV overnight with Busker, his new supervisor.  (Def. 11/4/03 Mot. to Dismiss, 8; JAG 2/19/02 Interview, P0006.)

      B.     <u>November 12, 2001 - Day of the Accident</u>

The accident occurred along the shoulder of I-95 on Veteran's Day, November 12, 2001.  Tolbert had been on sick leave for leg pain for two to three weeks before the accident, and he was scheduled to return to work the next day, November 13th.  (JAG 2/7/02 Interview, P002.)  Tolbert's leg pain affected his "ability to walk, bend, or reach," and he was taking pain medication.  (Rep. Busker, 000489-490.)

The parties disagree about Tolbert's actions on the morning of the accident.  Tolbert's personal car was in the repair shop.  (Rep. Busker, 000487.)  After the accident, Tolbert told his supervisor, Busker, that he drove his wife's car to Washington to conduct an interview.  (Rep. Busker, 000487.)  Tolbert's wife, Connie Tolbert, testified on deposition, however, that she used her car to go shopping that morning.  (Dep. Connie Tolbert, 112.)  Mrs. Tolbert stated that her late husband spent the morning writing reports at home.  Tolbert applied for (and received) four hours of overtime pay for the day.[8]  <u>See id.</u> at 84.

That evening, Tolbert retrieved the GOV from Greenbelt and drove it north to Columbia.

_____

[7]      Bergman is suffering from a terminal disease and could not testify.  Nonetheless, when he was contacted by the government, he confirmed that he granted Tolbert permission to take the GOV to Columbia to wash it.  Bergman could not remember how may times Tolbert made this request or how many times he granted it.  (Def. 11/4/03 Mot. to Dismiss, 8 n.3.)

[8]      DSS's investigation did not conclusively determine whether Tolbert went to Washington on the morning of the accident.  (Dep. Busker, 38-39.)

The purpose behind this trip is in dispute.  After the accident, Tolbert told his supervisor, Busker, that he intended to wash his GOV in Columbia and return the car to Greenbelt later that evening.  (Rep. Busker, 000487-89.)  The United States contends that Tolbert, whose own car was in the repair shop, intended to keep the GOV overnight in Columbia so that he could drive it directly into Washington the next morning.  (Def. 11/4/03 Mot. to Dismiss, 21.)

On the afternoon of November 12th, Tolbert asked his wife if she would drive him to Greenbelt to retrieve the GOV.  (Dep. Connie Tolbert, 62.)  She refused because she had become ill after returning from her shopping trip.  See id. at 112.  Tolbert then asked his daughter, La-Ita Summer Lagare, to drive him to Greenbelt.[9]  (Dep. Summer Legare, 10.)  Although Ms. Summer Lagare helped her father pick up the GOV, she told him that she could not take him back to Greenbelt later that night because she had other plans.[10]  (Rep. Busker, 000487.)

On the evening of November 12, 2001, Ms. Summer Lagare drove Tolbert to Greenbelt to pick up the GOV.  The accident occurred at 7:30 p.m. on I-95 as Tolbert drove north from Greenbelt towards Columbia.  At the time of the accident, the temperature was only 37 degrees. (Def. 11/4/03 Mot. to Dismiss, 18.)  Tolbert struck Collins as Collins, whose car had broken down, was walking for help along the shoulder of the highway.  According to the complaint, Collins suffered multiple bone fractures, a closed head injury, internal injuries, and acute respiratory failure.  (Compl., ¶ 4.)

Immediately after the accident, Tolbert telephoned his supervisor, Busker, who drove to

---

[9]    Tolbert did not tell his daughter the purpose of the trip to Columbia.  (Dep. Summer Legare, 10.)

[10]   It is not clear from the depositions whether Tolbert asked his daughter if she would drive him back to Greenbelt that night, or whether she volunteered that she could not drive to Greenbelt a second time.

the accident.  (Dep. Busker, 47-48.)  Tolbert explained to Busker that he intended to wash the

GOV in Columbia and return it to the Greenbelt lot that evening.  (Rep. Busker, 000487-489.)  It

is undisputed that Tolbert did not ask Busker for permission to take the GOV to Columbia that

night.  Nor did Tolbert ask for permission to keep the car overnight at his house.  (Rep. Busker,

000489.)  Tolbert stated that "he did not think about requesting permission from [Busker]."[11]  Id.

On December 4, 2001, Busker interviewed Tolbert as part of an administrative

investigation.  (DD Form 200.)  Tolbert stated that he intended to wash the GOV at the Amoco

gas station at Route 175 and Dobbins Road.  (Rep. Busker, 000488.)  Busker challenged Tolbert

by pointing out that the Amoco station closed at 8:00 p.m.  Because the accident occurred at 7:30

p.m. while Tolbert was 12-15 miles south of the Amoco, Tolbert would not have had time to

wash the car before the gas station closed.  Id. at 000489.  When challenged, Tolbert wavered by

saying that he would either have washed the car at home or at the car wash.  Id.  Tolbert further

explained that he intended to return the GOV to Greenbelt that night, and he planned to drive his

wife's car to work the next morning.  Id. at 000488-489.  He intended to drop her off at the Fort

Meade Army base (where she works), then continue on to Greenbelt to pick up his GOV, he told

Busker.  He would have driven his GOV into Washington for an early appointment, Tolbert

explained.[12]  See id. at 000489.

On February 7, 2002, Tolbert was interviewed by judge advocates from the Army Claims

---

[11]     Tolbert later explained that he did not ask for permission because he did not know
how to reach Busker on Veteran's Day.  (JAG 2/19/02 Interview, P0006.)
Tolbert never clarified how he was able to telephone Busker after the accident.

[12]     Columbia is about 15 miles north of Fort Meade.  It is about 17 miles from Fort
Meade to Greenbelt.  Accordingly, if Tolbert were to take his wife to work, he
would have added about 14 miles to his total commute.

Branch.  On this occasion, he stated that he intended to take the GOV to a car wash near his house that had "big lights so he could see while he was washing it."  (JAG 2/7/02 Interview, P001.)  On February 19, 2002, in a follow up interview with judge advocates, Tolbert stated that he planned to return to his house, pick up washing supplies, then proceed to a nearby car wash. (JAG 2/19/02 Interview, P0006.)

C.       DSS Proposed Disciplinary Action

On February 7, 2002, the DSS Director of Human Resources, Joanne Moffett, issued a Notice of Proposed Suspension for Misuse of GOV.  She concluded that, "it is more likely than not that you intended to take the GOV home for the evening without authorization to save you a commute to the satellite parking location at the beginning of your duty day the following morning."  (Not. of Prop. Susp., 0539.)  DSS's proposed suspension was never carried out because Tolbert soon thereafter retired from DSS due to a disability.  (Dep. Moffett, 82-83.)

**V.      Findings of Fact**

Under Jamison v. Wiley, 14 F.3d 222, 236 (4th Cir. 1994), this Court must resolve any "factual disputes that bear on a scope of employment issue...."  Having weighed the evidence, the Court makes the following findings of fact:

A.       Tolbert Did Not Go Into Washington D.C. on November 12, 2001

Tolbert did not drive into Washington on the morning of the accident because he did not have a car at his disposal.  Tolbert's car was in the repair shop, and Connie Tolbert used her car to go shopping.  She testified that when she returned she saw Tolbert writing reports at home.

B.       Tolbert Intended to Keep the GOV Overnight

Tolbert did not intend to return the GOV to Greenbelt on the evening of November 12th. Tolbert did not have transportation back to Greenbelt.  Connie Tolbert became ill after her

9

morning shopping trip, and she refused to drive Tolbert to Greenbelt to pick up the GOV.

Tolbert would not have expected his sick wife to make a 50 mile round trip at 9:00 p.m. on a

cold night for the sole purpose of washing and returning his GOV.  Tolbert's daughter had

clearly stated that she was unavailable to make the return trip.

While Collins theorizes that Tolbert could have taken a cab to Greenbelt or had his son

drive him, this is pure conjecture.  The logical explanation is that Tolbert did not have a

convenient way to get to his early appointment in Washington the next morning.  Tolbert's car

was in the repair shop, and his wife needed her car to go to work.  Keeping the GOV overnight

would allow Tolbert to drive directly into Washington for his early appointment the next day.

      C.        <u>Tolbert Was Likely Going to Wash the GOV in Columbia on the Evening of the Accident</u>

The Court assumes that Tolbert did, in fact, intend to wash the GOV in Columbia on the

evening of the accident.  It is likely that he planned to wash the car to justify keeping it

overnight.

**VI.**     **Analysis**

Applying the "scope of employment" factors to the facts results in the conclusion that

Tolbert was acting outside the scope of his employment.  <u>See</u> <u>supra</u> Part III.

      A.        <u>Whether the conduct is of the kind the servant is employed to perform</u>

Tolbert had two reasons to be on I-95 at the time of the accident.  His primary reason was

to pick up the GOV to keep it overnight.  He was aware, however, that DSS policy prohibited

keeping the car overnight without permission.  (Dep. Moffett, 21; Dep. Connie Tolbert, 48.)

Although Tolbert was expected to "perform operator maintenance," washing the GOV was only

Tolbert's secondary reason.  (DSS Reg. 15-20-R.)

B.      Whether the conduct occurred outside normal work hours

The accident occurred at 7:30 p.m. on Veteran's Day, well outside Tolbert's normal work

hours.  See Tregellas v. American Oil Company, 188 A.2d at 694, 698 (holding that an employee

was not acting within the scope of his employment when an accident occurred on a Sunday

afternoon).  Although Collins argues that Tolbert's hours were "varied," Tolbert almost always

conducted his interviews between 7:00 a.m. and 3:30 p.m.  (Dep. Connie Tolbert, 32.)  Tolbert

was not expected to wash his car outside regular work hours, and he would receive no overtime

pay for washing the car while off duty.  (Dep. Moffett, 49, 51.)

C.      Whether the conduct occurred outside the normal work area

Tolbert worked in Washington and parked his GOV in Greenbelt.  Tolbert was not

authorized to drive the GOV north of Greenbelt.  The accident occurred nearly 8 miles north of

the Greenbelt parking lot, and it was Tolbert's intent to take the car an additional 17 miles north

to Columbia.  See Tregellas, 188 A.2d at 694 (holding that an employee who worked in

Hyattsville, Maryland was not acting within the scope of his employment when he was driving

his employer's car on a weekend in Baltimore).

D.      Whether the employer expected such an act to occur and the previous relations
        between the employee and the employer

Tolbert's employer would not have expected him to take the GOV without permission

twenty-five miles north of the satellite lot to keep it overnight and wash it on a holiday evening

when it was only 37 degrees outside.  The fact that Tolbert's prior supervisor, Bergman, had

always granted permission does not change the equation.  The grant of permission in the past

does not mean that permission can be dispensed with.  See Williams v. Rene, 72 F.3d 1096, 1101

(3d Cir. 1995) (stating that permission given by the employer in the past did not establish that the

employee was acting within the scope of her employment when she did not ask permission on the day of the accident).  The pattern of seeking and receiving permission shows that both Tolbert and his supervisor knew that permission was required before Tolbert could wash the GOV in Columbia.  Moreover, Tolbert had never requested permission to keep the car overnight.

The United States has rebutted the presumption that Tolbert was acting within the scope of his employment.  Accordingly, this case must be dismissed for lack of subject matter jurisdiction.  While the Court it sympathetic to Collins, the Court must resist the temptation to bend the law in favor of an injured plaintiff.  The Court must apply the scope of employment factors neutrally and in a manner consistent with common sense.  Common sense points strongly in one direction, namely that, at 7:30 p.m. on Veteran's Day 2001, Tolbert was driving outside the scope of his employment.

## VII.    Conclusion

For the foregoing reasons, the Court will, by separate Order, (i) GRANT the United States's Motion to Dismiss; (ii) DENY Collins's Motion for Summary Judgment; and (iii) DIRECT the Clerk to CLOSE the case.

Dated this 15th day of December, 2005.

_____/s/_____
Benson Everett Legg
Chief Judge